

**FILED**

Jun 21 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ s/ Josepht _____ DEPUTY

1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  GEORGE C. AGUILAR (126535)
   MICHAEL J. NICOUD (272705)
3  600 B Street, Suite 1900
   San Diego, CA 92101
4  Telephone: (619) 525-3990
   Facsimile: (619) 525-3991
5  E-mail: brobbins@robbinsarroyo.com
6         gaguilar@robbinsarroyo.com
          mnicoud@robbinsarroyo.com
7

8  Attorneys for Plaintiffs

9              UNITED STATES DISTRICT COURT

10           SOUTHERN DISTRICT OF CALIFORNIA

11  RICHARD BARTLETT AND              )  Case No.   '18 CV 1374 BEN NLS
    KRISTINE SNYDER, on Behalf of     )
12  Themselves and All Others Similarly )
    Situated,                          )  CLASS ACTION
13                                     )
                                       )  COMPLAINT FOR VIOLATIONS OF
14              Plaintiffs,            )  CALIFORNIA'S CARTWRIGHT ACT
                                       )  AND UNFAIR COMPETITION LAW
15       v.                            )
                                       )
16  BP WEST COAST PRODUCTS            )
17  LLC; CHEVRON U.S.A. INC.,          )
    TESORO REFINING &                  )
18  MARKETING COMPANY LLC,             )
    EQUILON ENTERPRISES LLC,           )
19  EXXON MOBIL CORPORATION,           )
    VALERO MARKETING AND               )
20  SUPPLY COMPANY,                    )
21  CONOCOPHILLIPS, ALON USA           )
    ENERGY, INC., and DOES 1-25,       )
22  Inclusive,                         )
                                       )
23              Defendants.            )
24  _____   )  DEMAND FOR JURY TRIAL

25

26

27

28

Plaintiffs Richard Bartlett and Kristine Snyder ("Plaintiffs") hereby bring this action for damages and other relief against defendants BP West Coast Products LLC ("BP West"), Chevron U.S.A. Inc. ("Chevron"), Tesoro Refining & Marketing Company LLC ("Tesoro"), Equilon Enterprises LLC (d/b/a Shell Oil Products US) ("Shell"), Exxon Mobil Corporation ("ExxonMobil"), Valero Marketing and Supply Company ("Valero"); ConocoPhillips ("Phillips"), and Alon USA Energy, Inc. ("Alon") (collectively, "Defendants"), for violations of California's Cartwright Act (California Business & Professions Code §16700, *et seq.*) and California Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §17200, *et seq.*).  Plaintiffs make all allegations upon information and belief except as to those paragraphs that are based on their own personal knowledge.

## INTRODUCTION

1.      This action concerns Defendants' illegal conspiracy to manipulate and maintain the prices of gasoline in California at supracompetitive prices.   In particular, Defendants, gasoline refiners, have used their market leverage to keep gasoline prices in California well above the U.S. average, reaching a peak of $1.50 per gallon above the national average in Southern California in 2015.  Californians consume forty million gallons of gas a day.  According to some reports, as a result, Californians paid more than $10 billion extra at the pump compared to other drivers in the United States.  At the same time, Defendants' profits from their California refineries reached obscene levels.

2.      The oil industry blamed the 2015 jump in oil price on an explosion that occurred in February 2015, at a refinery in Torrance, California.  However, even after the Torrance refinery came back online, Californians have continued to pay an unexplained surcharge for their gasoline (even after taking into account California's taxes and other unique aspects).  In fact, while fuel prices fluctuate, Californians have, on average, paid a premium at the pump in every month since the Torrance

refinery explosion over three years ago.

3.     The 2015 spike was not the first time that California's gasoline prices moved drastically out of line with the national average.  In early 2012, the crude oil markets experienced a combination of rising production, falling demand, and increasing inventories.  Despite these market forces which would suggest the opposite, California gas prices increased substantially.   In particular, in May and October of 2012, California saw two massive gasoline price spikes, resulting in California consumers paying more than $4 a gallon—and in some areas more than $5 a gallon.  These spikes occurred while the rest of the country experienced a decline in gas prices.

4.     The refineries blamed the increased prices on decreased supply because of a fire at a Washington state BP West refinery and other maintenance shutdowns in California.  The evidence, however, did not to support that theory.

5.     Because the market is so concentrated, the West Coast is highly sensitive to fluctuations in supply, and primed for manipulation.  As a June 5, 2012 report by McCullough Research explained, in such a highly concentrated industry, "a single actor or a very few actors acting together can set the price in the market." After the fire at the Washington plant, the degree of market concentration increased significantly.   With the market so concentrated, the timing of the various unscheduled maintenance shutdowns in the California refineries in early 2012 became suspect.  "In a competitive market, maintenance would have been delayed to take advantage of the rising West Coast prices."

6.     Another report issued on November 15, 2012 by McCullough Research (the "McCullough Report"), concluded that during the May and October spikes there were market anomalies present, and that during those two periods, gas refiners in California were seeing an "enormous windfall profit."  Further, the McCullough Report determined that in both the May and October spikes, "the underlying data

now available contradicts the industry explanations."

7.     Data from the U.S. Energy Information Administration ("EIA") during that time showed that the refineries serving West Coast states had the capacity on hand to meet significant shortfalls, such as one caused by a fire or a shutdown because of unscheduled maintenance.

8.     In addition, Defendants had access to addition fuel reserves through, for example, fuel tanker capacity.  Rather than provide California with this supposedly much needed gasoline, Defendants shipped gasoline *out of California* and allowed other tankers to idle unused.

9.     The reason for the spikes in gasoline prices is now evident.  The fire and shutdowns were cover for the refiners' scheme to create a false impression of a shortage in order to force prices up and reap windfall profits.  Accordingly, Plaintiffs now bring this action on behalf of the retail purchasers of gasoline in California, those that were most hurt by Defendants' illegal actions.

## THE CONSPIRACY

10.     For years Californians have seen spikes in gasoline prices, seemingly untethered to normal market forces of supply and demand, and an average price per gallon substantially above the national average.  An analysis of the now available data shows that this increased gas prices were not the result of California's market structure, but instead are the result of Defendants' anticompetitive conduct.

**The May and October 2012 Price Spikes**

11.     In May 2012, California, Oregon, and Washington were hit with significant spikes in the price of gasoline.  Refiners blamed the May spike on the February 18, 2012 fire at the Cherry Point refinery in Washington state.  This excuse made little sense due to the length of time between the fire and the price spike.

12.     Refiners also claimed that maintenance shutdowns caused the decrease in supply and increase in price.  These shutdowns, however, were particularly suspicious.  In fact, in a short window of less than four weeks between April 20 and May 15, defendants Alon, Shell, Tesoro, Chevron, and BP West each scheduled a shutdown of their refineries for maintenance.  As detailed below, however, emissions data showed that certain of these refineries appeared to continue to operate.

13.     Then, in August 2012, gasoline prices spiked again.  This time, refiners blamed the spike on an August 6, 2012 fire at Chevron's Richmond, California, refinery.  Again, the excuse made no sense in light of the fact that inventories actually increased up to and during the price spikes.  In a trust competitive market governed by supply and demand, an increase in supplies would drive down prices.[1]

14.     Chevron later agreed to pay $2 million in fines and restitution, and pleaded no contest to charges filed by the Attorney General and District Attorney in connection with the fire.  The charges included failing to correct deficiencies in equipment and failing to require the use of certain equipment to protect employees from potential harm.  This was a first of a series of fines against Defendants over readily noticeable defects that led to refinery shutdowns.

15.     In October 2012, the price of gas again spiked on rumors of a gasoline shortage.  The California Energy Commission later claimed that a minor plant problem at ExxonMobil's Torrance refinery was to blame for the increase in wholesale prices.  Again, the facts belie this explanation.  In particular, the wholesale price began spiking before the Torrance refinery's issues were publicly

---

[1] The November 15, 2012 McCullough Report noted that "[t]he argument that the price spikes on the West Coast are caused by supply shortages is contradicted by the increasing gasoline inventories during the period of extraordinary prices."

announced and jumped $0.35 per gallon within forty-five minutes of the first substantive coverage by the media.   In contrast, the twenty-seven other similar events in 2012 that occurred at the Torrance facility did not create increases anywhere near those that occurred in October 2012.  Further, Southern California Edison said there was barely any change in the electrical flow on October 1, 2012.

16.   The evidence also indicates that the major oil companies likely had advance notice that ExxonMobil would report problems with its Torrance refinery in October 2012.  According to the McCullough Research's July 2013 report (the "2013 McCullough Report"), after the Torrance facility "flare" on October 1, 2012, "all the majors came out and bought."  The major oil companies would not have bought in the open market based on the information available at the time in the marketplace, which indicated only a minor problem at the plant.  Instead, this run up would have happened only if ExxonMobil informed its competitors of operating problems, prior to informing the regulators and media.  Additionally, the nitrogen oxide ("NOx") emissions data does not support evidence of a full plant closure, and press releases by the company overstating the problem.

17.   Consumer Watchdog said that the report raises the specter of "criminal conduct" "reminiscent of the Enron-like manipulation of the California energy market."   Ronald D. White, *Consumer advocates say refineries may have falsified information*, L.A. Times (Nov. 16, 2012), *available at la-fi-mo-call-for-investigation-20121116.*

18.   The following table details the suspicious plant closings in 2012, while the price of gasoline spiked, and maintained high levels compared to the rest of the country:

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|---|---|---|---|---|---|---|
| 2/17/12 | BP | Cherry Point, WA | 20% | Unplanned | Fire | The May price spike was blamed on the outage at Cherry Point, the third largest refinery on the West Coast. The early May restart encountered problems and was halted. Ultimately, this refinery reopened on May 31 after repairs and maintenance were completed. |
| 4/20/12 | Alon | Bakersfield | 3.2% | Planned | Hydrocracker restarted. | No information |
| 4/27/12 | Shell | Martinez | 7.62% | Planned | Maintenance | Shell claimed that the refinery was shut down until May 16, 2012, yet NOx emissions data show that the refinery in fact started operating again sometime between May 6 and May 11, 2012. |
| 5/2/12 | Tesoro | Martinez | 8.70% | Planned | Hydrocracker restarted. | No information |
| 5/12/12 | Chevron | Richmond | 12.90% | Planned | Seasonal maintenance | Blamed for May price spike along with BP's Cherry Point refinery outage in February. Chevron announced that it would be taken offline from May 12 to May 26, but the NOx emissions data show otherwise during that period. |
| 5/15/12 | BP | Carson | 12.96% | Planned | Planned Flaring | BP reported in a filing with state pollution regulators on May 15 a planned flaring scheduled to take place from May 15-21. |

| 8/6/12 | Chevron | Richmond | 12.90% | Unplanned | Fire | After a fire, Chevron shut down its Richmond refinery, the largest refinery in the state. The refinery remained offline for several months, operating at 60% capacity. A Chevron spokesperson said the fire was one factor that caused the price increase in August among others, including the price of crude oil. However, data collected by the California Energy Commission showed that increased production at other refineries more than made up for the Richmond loss. Chevron agreed to pay $2 million in fines and restitution and pleaded no contest to six charges in connection with the fire. |
| 10/1/12 | ExxonMobil | Torrance | 7.8% | Unplanned | Power failure | This outage was blamed for the October price spike, yet the price began spiking prior to its public release, indicating that other oil companies had advance, secret notice. The shutdown lasted four days. Although Exxon claimed there was a disruption in power, Southern California Edison said there was barely a blip in the electrical flow that day. |

19.    The refineries' explanation for the price spikes is not consistent with the principles of supply and demand, and is inconsistent with the structure of the industry.   The California refinery system as a whole had plenty of stock and

1    capacity to manage several plant shutdowns.   Refineries' production schedules
2    are not perfectly matched to changes in seasonal demand—gas sales peak in the
3    summer months, while gas production is relatively flat over the year, with a dip in
4    February.   Typically, the market has adjusted smoothly to the seasonal factors and
5    gas prices remain stable (tracking the cost of crude and other inputs) even when
6    sales exceed production, with the price spikes in 2012 being exceptions.

7        20.    Analysts have been skeptical of the industry's justifications for the
8    radical price increases, with some speculating that the companies are artificially
9    increasing pump prices.   *See* Joseph Rose, *Oregon, Washington Gas Prices Face*
10   *'Prolonged Period' of Increases After Chevron Refinery Fire*, The Oregonian
11   (Aug. 21, 2012), *available at* http://blog.oregonlive.com/commuting/2012/08/
12   Oregon_washington_gas_prces_f.html.

13       21.    Despite widespread public calls for an explanation for the spikes, no
14   economically sensible explanation has yet been given

15       22.    Irregularities in Defendants' record keeping bring into doubt the
16   accuracy and reliability of the maintenance and outage reports provided by the
17   refineries to California.   Take for example the Richmond refinery.   Data tracking
18   the Richmond refinery's FCC and TKC (measurable components of the gas oil
19   processing at the refinery) demonstrate that the Richmond refinery was in fact
20   still emitting mono-NOx during this period of "closure."[2]   These inconsistencies
21   bring into doubt the accuracy and reliability of the maintenance and outage reports
22   provided by the refineries to California.   Similarly, Shell's Martinez, California,
23

---

24   [2] During other cases of market manipulation in California, announcements by power
25   producers about plant outages "have been discovered to be intentionally unreliable."
     *See United States v. Reliant Energy Servs., Inc.*, No. 04-cr-125, Indictment (N.D.
26   Cal. Apr. 8, 2004) (Dkt. No. 1) at 5 (where Reliant was charged with disseminating
27   false and misleading rumors and information about the availability and maintenance
     status of the defendant's power plants).
28

refinery reported a shutdown from April 27 to May 16, 2012, but the emissions data indicates that the refinery started operating sometime between May 6 and May 11, 2012.

23.    In October 2012, prices were $0.66 per gallon higher than they would be normally, given the historical patterns of oil prices and gas inventories.  The past sales for the month of October have averaged more than one billion gallons per month.  If the historical averages held, and the numbers were adjusted for variations in the market for fixed costs, this would mean that Defendants received windfall profits of about $25 million a day from the Class (as defined herein).  Using the same overcharge calculation, the members of the Class paid approximately $1.3 billion more at the pump during the May 2012 price spike, than they should have absent the Defendants' conduct.

24.    This windfall is supported by historical data.  *See* Jamie Court & Liza Tucker, *New Report: Oil Refiners' Profits Spike With Gasoline Price Spikes*, Consumer Watchdog (May 5, 2015), *available at* http://www.consumerwatchdog. org /newsrelease/new-report-oil-refiners%E2%80%99- profits-spike-gasoline-price-spikes (finding that profits for Tesoro and Valero were "twice as high as the refiners' average quarterly profit in quarters where gasoline prices spiked"); *id.* (quoting a Chevron General Manager, who stated: "Margins increased earnings by $435 million driven by unplanned industry downtime and tight product supply on the US West Coast.").

25.    Below is a chart from the McCullough Report comparing actual retail gas prices to forecasted retail prices:



26.     Not surprisingly, the Western States Petroleum Association ("WSPA"), an industry group made up of the Defendants, among others, issued a critique of the McCullough Report.  In response, McCullough Research issued a rebuttal (the "McCullough Rebuttal"), noting that the WSPA's report "does not offer an explanation for the price spikes, nor does it perform any analyses that would justify its opinions."   Further, the McCullough Rebuttal noted that "WSPA's response provides no explanation, additional data, or statistical analyses for the price spikes in May and October 2012.  Its proposed variable changes are neither substantive nor explanatory."   Moreover, McCullough Research noted that based on its "experience with Enron, we suggest that erroneous information in the media can be a form of market manipulation.... Since little information is available on refinery operations, an erroneous press release may have significant impacts on market prices...  [T]here is evidence that this was a factor in both May and October 2012."

**Details of the 2015 Price Spikes**

27.     Like the 2012 spikes, a series of suspicious refinery closures and slowdowns preceded the 2015 spikes in California gas prices, defying input costs.

On February 2, 2015, Tesoro shut down its Martinez refinery in the face of a steelworkers' strike, citing "safety" reasons, rather than allowing it to run at less than full capacity during planned maintenance.

28. Defendants told the investors a much different story than the general public in California. Despite the strike, Tesoro Chief Executive Officer ("CEO") Geoff Goff told investors that the company could continue to operate refineries indefinitely, with reduced staffing levels. Tesoro's CEO stated, "And we feel very comfortable that we can continue on running with the staffing levels we have, the trained and experience people have operating the refineries for – and it's a very long period of time."

29. The use of refinery outages to drive price spikes continued throughout 2015. As the *Los Angeles Times* reported on December 21, 2015:

> While motorists nationwide are enjoying gas at $1.99, the L.A. average climbed to $2.87 and could continue rising as delays plague repairs at Exxon Mobil's Torrance plant, which has been operating at less than 20% capacity since a February explosion. The statewide average was $2.72.
>
> The plant was expected to return to full service by mid-February. But now the latest projections are that repairs will not be completed until as late as April 1.
>
> In addition, Tesoro's Carson refinery and Chevron's El Segundo site reported unplanned outages, as well as maintenance downtime, within the last month. Compounding the problem is an unplanned outage at Chevron's Richmond plant in Northern California and a storm-damaged Tesoro plant in Anacortes, Wash.
>
> Gordon Schremp, a senior fuels analyst for the California Energy Commission, said in all, about 30% of the state's refining capacity is offline.
>
> "In a phrase," Schremp said, "chronic refinery problems continue, unfortunately."

30.   Then, on February 18, 2015, ExxonMobil shut down its Torrance refinery after a supposed explosion.  This Torrance refinery supplies approximately 10% of California's gasoline.

31.   The shutdown at ExxonMobil's only California refinery in February 2015 reduced gas supply in Southern California and depleted the state's already-short reserves.   Further, according to industry insiders, refinery maintenance schedules were inexplicably moved forward despite an apparent lack of supply.

32.   The Torrance fire is particularly suspicious.   After investigating the Torrance refinery in the wake of its closure, the Division of Occupational Safety and Health (DOSH) (hereafter, "Cal/OSHA") fined ExxonMobil $566,600 for nineteen workplace health and safety violations, six of which were determined to be willful. On August 13, 2015, Cal/OSHA issued a press release stating that, "Six of these serious violations were also classified as willful because Cal/OSHA found that Exxon did not take action to eliminate known hazardous conditions at the refinery and intentionally failed to comply with state safety standards."

33.   An August 13, 2015 article in the *DailyBreeze* described the egregious and willful lapses at the Torrance refinery and the results of the Cal/OSHA investigation as follows:

> Officials with the state Department of Industrial Relations said the "investigation revealed severe lapses in Exxon's safety protocols." "It's pretty rare for a compliance officer to issue one willful citation, let alone six willful citations," said Clyde Trombettas, who heads up the department's process safety management unit, which is responsible for inspecting chemical plants and refineries in California.
>
> "An employer has to be pretty egregious for us to do something like that," he added. "It's trying to send a message that we need to take these things seriously."
>
> Indeed, the unusual number of serious citations appears to have prompted the county District's Attorney's Office to request copies of

the citations for possible criminal prosecution, Trombettas said.

A spokeswoman for the district attorney noted that the agency does not usually confirm the initiation of criminal investigations; she then declined comment.

But the CAL/OSHA announcement revealed stunning and deliberate lapses in fixing potentially dangerous conditions. CAL/OSHA said Thursday the blast was due to a release of hydrocarbons from the refinery's fluid catalytic cracker unit into its electrostatic precipitator.

The hydrocarbons ignited and caused the explosion that injured four workers and hurled debris and contamination over a wide area of Torrance.

34.    As to refinery shutdowns and capacity reductions, memos from West Coast oil refiners from the 1990s and released in 2011 by Senator Ron Wyden (D. Or.), suggest that the practice of reducing capacity is a deliberate business strategy that has been employed by the refineries for a number of years.  An internal Chevron memo, for example, stated: "A senior energy analyst at the recent API [American Petroleum Institute] convention warned that if the U.S. petroleum industry doesn't reduce its refining capacity, it will never see any substantial increase in refinery margins."

35.    A May 21, 2015 letter from Jamie Court, Liza Tucker, and Cody Rosenfield, to a number of western state attorneys general noted:

Since the beginning of February, California's fourteen oil refineries have suffered ten serious slowdowns or shutdowns, many due to questionable causes or timing.  The timing of these overlapping outages raises questions about their true necessity, and about whether some refinery capacity may have been taken off line in order to drive up prices and profits for oil refiners at [a] time when some of their crude operations have been yielding less profits.

36.   The following table details the recent suspicious plant closings:

| Date | Company | Refinery | Amount of Statewid | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|--------------------|----------------|----------------|------------------|
| 2/2/2015 | Tesoro | Martinez | 8.70% | Unplanned | Tesoro said it would close its Martinez refinery in the face of a steelworkers' strike for "safety" reasons. | Refineries can run without a full staff once operations are well under way. Weeks later Tesoro's CEO, Geoff Goff, told investors that the company could continue to operate its refineries indefinitely with reduced staffing levels despite the strike. Steelworkers complained that management increasingly used contract workers to run refineries. They would have also been available to run the Martinez facility, raising questions about the "safety" reason for full closure of Martinez. |

- 14 -

| 2/18/2015 | ExxonMobil | Torrance | 7.80% | Unplanned | An "incident" on the Torrance refinery's premises. | Major explosion and fire blew off sections of a 12-story electrostatic precipitator that cuts pollution. Industry sources said the refinery had made operating errors that led to the accident and that the refinery will not come back on line again until July or August. Company reputedly may not bring facility back on line at all, or close it down completely. That would further reduce the state's refining capacity. |
|---|---|---|---|---|---|---|
| 4/17/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never publicly disclosed. | A fire prompted a shutdown of a gas oil hydrotreater for several days. |
| 4/21/2015 | Chevron | Richmond | 12.90% | Unplanned | Chevron notifies local officials of an unspecified unit and said flaring was part of "normal refinery | No information. |
| 4/21/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never disclosed. | Offline temporarily due to "operational glitches." |

| 4/23/2015 | Chevron | El Segundo | 14.50% | Planned | Company would not comment | Chevron reportedly had an "unplanned" problem with one reformer unit and moved up planned maintenance schedule. The outage will last until at least mid-June and could include an unknown number of other units. The necessity of the maintenance and how much capacity is or will be affected is unclear. |
| 5/9/2015 | Tesoro | Martinez | 8/70% | Unplanned | Never disclosed | Two compressors out on May 9 and 10 |
| 5/13/2015 | Phillips | Wilmington | 7/30% | Planned | None; would not identify units. | Work may focus on hydrocracker used for diesel production, which was scheduled to have maintenance in June. Unclear if related to the failure of a nearby hydrogen plant that supplies this blending component. No information about effect on production output. |
| 5/18/2015 | Phillips | San Francisco | 4.10% | Unplanned | Phillips 66 does not reveal reasons, but states operations continue | Flaring triggered by unplanned breakdown. Effect on production output unknown. |
| 5/19/2015 | Tesoro | Martinez | 8.70% | Unplanned | Declined to identify unit involved, said only that plant operations continue | No information |

| 5/19/2015 | Tesoro | Carson | 12.60% | Planned | Never disclosed | Due to planned maintenance on a hydrotreater. Company set to perform work on hydrocracker in July. No information on effect on production output. |
|-----------|--------|--------|--------|---------|-----------------|----|

37.    ExxonMobil could have made up the Torrance deficit by using its tanker to transport fuel from out-of-state or international refineries to California. But rather than bring badly-needed imports to the market during the height of Southern California's gasoline price spike and summer driving season, ExxonMobil kept its vessel, the S/R American Progress, in the U.S. Gulf Coast for four months before idling it in Singapore for seventy days.  By making its tanker unavailable at a critical time, ExxonMobil ensured that California gasoline supplies were kept short, driving up prices and ExxonMobil's profits.

38.    In particular, on May 15, 2015, during the middle of the gas shortage and major price spike in Southern California, the S/R American Progress arrived empty in Los Angeles, California, from the U.S. Gulf.

39.    The S/R American Progress is a Jones Act vessel, which makes it one of a select few ships allowed under federal regulations to carry petroleum products between U.S. ports.

40.    Such tankers very rarely go to foreign ports, as these trips are a waste of these rare ships' limited resources.  Yet on June 20, 2015, ExxonMobil sent the tanker from Los Angeles all the way to Singapore, where the S/R American Progress idled and roamed aimlessly until August 31, 2015.

41.    Singapore is a major international gas hub, where ExxonMobil owns one of the largest refineries in the world—a refinery that produces more than twice as many barrels per day as the largest refinery in California.  Moreover, the gasoline ExxonMobil's Singapore refinery produces can be used in California.   Yet,

ExxonMobil did not use the S/R American Progress to relieve the Californian gasoline crises.

42.     Although the S/R American Progress eventually returned to Los Angeles with a full tank of product, it did not unload its cargo.  Instead, the tanker left Los Angles without unloading and delivered its gas shipment to Florida.

43.     ExxonMobil only imported gasoline when it could no longer buy gasoline from third parties and was at risk of failing its contractual obligations. Using a ship called the FPMC 21, ExxonMobil brought gasoline from Singapore to Los Angeles on August 2, 2015, showing that the company was readily able to resupply the Southern California market during the period its Torrance refinery was down.  Yet ExxonMobil made no effort to import gasoline to make up for lost production.

44.     During the time its Torrance refinery was shut down, ExxonMobil imported just twelve million gallons of gasoline, an amount equivalent to only three days of production at the Torrance facility.

45.     By contrast, the lost production that resulted from the Torrance shutdown during this period was over 800 million gallons, or 20% of Southern California's refining capacity.

46.     As data from the California State Lands Commission show, ExxonMobil purchased gasoline from other California refiners until it was forced to import gasoline to meet contractual obligations, rather than import to resupply the market, as confirmed by the industry news service, *Platts*.

47.     Only three of the thirty-two confirmed gasoline shipments to California during the Torrance shutdown were shipments for ExxonMobil: one shipment in March, one in April, and one in August 2015.

48.     During this time ExxonMobil did, however, continue to import other products that it relies on, such as Alkylate.  ExxonMobil purchased the gasoline it

mixes with Alkylate to provide premium gasoline to the Southern California market from other companies instead of importing it.  As the industry news service *Platts* observed, "ExxonMobil has been buying barrels from other refiners and trade houses to meet its commitments."

49.    ExxonMobil's failure to resupply the California market, when it easily could have, occurred while other companies like Chevron were exporting gasoline from California to further diminish supply, suggesting a collusive effort to manipulate the gasoline market and drive up profits.  During the first three quarters of 2015, for example, Chevron exported six days' worth of California gasoline supply.  Although Chevron controls only 28% of the market's refining capacity, it was responsible for 66% of all gasoline and additive exports from California during this period.

50.    Similarly, pursuant to the alleged agreement to decrease supplies, refiners in California continued exporting gas products out of the state. As reported by the *Daily News* on July 27, 2015:

> On June 25, just one week before many California motorists began paying upwards of $4.30 per gallon for gasoline, the Bahamian-flagged tanker Teesta Spirit left Los Angeles headed for ports on the west coast of Mexico carrying more 300,000 barrels of gasoline refined in California. The Teesta Spirit was just one of nine large tankers that left California ports carrying gasoline to places like Mexico and Chile between June 25 and July 23, at a time when oil companies were raising prices by as much as $1 per gallon in some regions. Altogether, oil companies like Chevron and Phillips 66 shipped about 100 million gallons (42 gallons per barrel) of gasoline out of California during that time span. The industry explained its huge price increases, levied this time primarily in Southern California, by citing a shortage caused partly by a February explosion that disabled a pollution monitoring unit at Exxon Mobil's refinery in Torrance. No one explained why it should take more than five months to fix that machinery. Executives of the industry's Western States Petroleum Association did not respond to repeated telephone attempts to get their explanations for this and for the gasoline exports, which

amounted to sending away almost three full days' statewide supply of gasoline. As the oil companies were shipping out that fuel, they reaped unprecedented profits reportedly approaching $1.50 for every gallon of gasoline they sold at the higher prices.

Prices, said WSPA President Catherine Reheis-Boyd in a letter responding to a previous column that alleged gasoline price gouging, are a result of supply and demand.

This may be true, but there's ample evidence the oil firms she represents create some of the shortages they cite as a cause of pricing volatility. It's not just the continued exports and any problems at Exxon Mobil in Torrance. They ascribed another price spike earlier this year to shutdowns at refineries in the Martinez/Benicia area northeast of San Francisco. Labor issues, they said, forced those shutdowns. But former employees of one of those plants reported they've been kept open during previous, similar labor disputes and could have stayed open this year, too.

Said Reheis-Boyd, "All of the many government investigations ... in recent years have concluded that supply and demand are the primary reason (sic) gas prices go up and down."

Shipping information makes it clear any recent shortage was created at least in part by the companies themselves. Here are some examples: The Atlantic Queen left Long Beach headed for Mexico on June 25 with a capacity of over 398,000 barrels of gas. The Iver Exact, only slightly smaller, left San Francisco Bay heading for Mexico on June 28. The larger Pudu left Long Beach for South and Central America on July 7. Several other tanker departures from both Northern and Southern California ports were scheduled through the first week of August. How can the industry claim it has short supplies while it's shipping gas to foreign countries?

Why should California residents suffer the pollution produced by gasoline refineries if the owners of those plants manipulate prices by sending gasoline to foreign users?

Said Jamie Court, president of the Consumer Watchdog advocacy group, "Oil refiners have kept the state running on empty and now they are sending fuel refined in California abroad just as the specter of low inventories drives huge price increases.

51.     Chevron's actions further suggests a pattern by oil refiners to artificially constrain gas supplies to California's market and thereby raise prices, as shown by Consumer Watchdog.  Based on documents it obtained pursuant to public records requests from the California State Lands Commission's shipping records, Consumer Watchdog found that Chevron exported 250 million gallons of gas, while gas prices reached $4.20 per gallon in Southern California in the summer of 2015.  Consumer Watchdog's Jaime Court said, "Chevron, during the period we charted last year, brought only three ships in to make up for about three days of lost capacity at that one refinery and it's been out 360 days right now.  So when you don't make the gasoline you promise and you don't bring ships in to backfill it, it's going to run the inventory levels way down."

52.     Consumer Watchdog also reviewed export data and found that between August and September 2015, California's refiners exported over eighty million gallons of refined petroleum products.   In a September 3, 2015 press release, Consumer Watchdog stated:

> Consumer Watchdog's review of industry data also shows that during the last week six tankers are or have loaded up to 2 days of Californians' petroleum supplies at California refineries for foreign export. The capacity of the ships, which are carrying California refined products as opposed to crude oil, totals over 80 million gallons, which is two days of the state's fragile gasoline supply.
>
> Below are the ships that have left California with refined products over the last two weeks.

53.     In December 2014, refineries exported the most gasoline in history.  For the month of December 2014, West Coast refiners exported 2.7 million barrels, or 113 million gallons of gasoline.  The exports also constituted the most exports in a quarter ever.

54.    June 2015 data showed another record export month.  Californians paid $3.6 billion more for their gasoline than the average U.S. motorist, based on the added pump price from February through May of 2015.  "Oil companies created a shortage by selling abroad, and then shutting down refineries, and have made billions at the expense of Californians who are paying a huge premium due to the state's low inventories," Consumer Watchdog's Cody Rosenfield said.

55.    Further indications of an agreement between Defendants are based on the simultaneous increase of gas prices in February of 2016.  "Oil refiners made billions extra last year because of our pain at the pump and after a short respite the pain is going to continue. What's remarkable is that the four major oil refiners all raised the prices to their branded stations, 75% of the Southern California market, in unison and by nearly the same amount.  When four refiners control nearly 80% of the gasoline production" and "75% of the stations in the area this market is rigged for refiners' profit and drivers' pain," Rosenfield stated.

56.    In short, during this time period, imports of gasoline to California came to an abrupt halt, while California inventory was declining toward its lowest point, and exports increased, all in a coordinated fashion.

**Defendants Reap Outsized Profits**

57.    As succinctly stated by Jamie Court, president of Consumer Watchdog, "California's oil refiners are the only industry in America that make a fortune when their factories break down….  The oil companies are acknowledging to investors that that they have been getting fat off the shutdowns in their own refineries even as they refuse to appear before legislators in Sacramento."

58.    Unsurprisingly, the first quarter of 2015 was one of the most profitable for California refiners in recent history.  "Despite refiners' claims that their costs were rising, profits per barrel of gasoline in California actually increased by a staggering amount - disputing industry assertions that higher costs were merely

being passed to consumers," a June 30, 2015 consumer watchdog publication stated.

59.     In 2015, average refiner margins in California were nearly $1 per gallon more than double their sixteen-year average margins of $0.48 per gallon.  During the week of July 13, 2015, oil refiners made a record $1.61 per gallon.  Although the price of crude oil in 2015 dropped to more than half of what it was for much of 2014, refiners increased their profit margins, rather than passing on the savings to consumers.

60.     Tesoro, California's second biggest refiner, shut down its Martinez refinery in early February and had to buy gasoline on the spot market to fulfill contracts, yet it still made a first quarter 2015 profit of $119 million.   Tesoro's CEO Greg Goff trumpeted this news to investors in a May 8, 2015 conference call: "In California, crack spreads [difference between crude oil costs and wholesale prices] have improved related to the unplanned and planned refinery maintenance activities."  He also noted: "There's no question that during the first quarter with what happened to Tesoro as a result of the disruption at the Martinez refinery because of the labor disruption and then with other operating and planned maintenance things across the whole system, it was very supportive to the margin environment there."

61.     Jeff Gustavson, a Chevron general manager made similar comments on May 21, 2015, during an investor call.  "Margins increased earnings by $435 million driven by unplanned industry downtime and tight product supply on the US West Coast."

62.     For the entire year, Tesoro made $1.9 billion on California refining, its best year ever by over $1 billion.  Valero tripled its average profits over the previous five years with its $852 million in California profits in 2015.

63.     ExxonMobil, despite having shut down its Torrance refinery for the better part of the 2015 year, nonetheless increased its sales of gasoline in California

by nearly 4% compared with 2014.  It did so through exchange agreements with its competitors to use their refineries, including Tesoro, that signaled to the other refiners that Torrance would not be online for a long period of time.  The market, however, was left in the dark, as ExxonMobil provided misinformation that the refinery would come back online at various points in the year.

64.    Materials presented on June 30, 2015 by the California Energy Commission, support the fact that "[r]efinery problems have been significant and sustained during 2015," and that "[t]hese issues have occurred with a backdrop of lower-than normal inventory levels."  The Commission also noted: "Strong price spikes at refinery wholesale level quickly transferred through to distribution terminals and retail."

65.    The following chart shows the low gasoline inventory levels, which can "exacerbate price responses to refinery issues."  Further aggravating the issue, refineries know that running on short supply of California's special California Air Resources Board ("CARB")-complaint gasoline (gasoline with 5.7% ethanol as an oxygenate), which is not generally imported into the state, creates a situation where a substitute is not generally available.  Therefore, when a refinery goes down, gas prices go up and the refineries profit.





66.     In 2016, refiners continued to reap outlandish profits in the California market.

67.     In August 2016, though the price of gas on California's wholesale market was the lowest in the United States, the state had the highest gasoline prices. The discrepancy between wholesale and retail prices is the second highest in history following the Great Recession's spread in October 2008:

> "If we have the lowest wholesale price for gasoline we should also have the lowest retail price for gasoline," said Jaime Court, founder of Consumer Watchdog. "The fact that we have the lowest wholesale price for gasoline and the highest retail price for gasoline means that oil refiners are ripping us off."

Except in October 2008, when the nation was struggling with the great recession, the gap between wholesale and retail market prices is the widest it has been.

"Usually, it's about 80 cents difference between the wholesale and the street price," said Cody Rosenfeld, a researcher for Consumer Watchdog. "But right now in California, we're charging $1.60 more per gallon of gasoline than the wholesale price. It's really unheard of. It's 70 cents more than the usual difference."

68.     Consumer Watchdog attributed the gap to the unprecedented profits California refineries are reaping in an August 4, 2016 press release:

Today oil refiner Tesoro reported $332 million in profits from California oil refining during the second quarter. Valero had reported $141 million in state oil refining profits during the second quarter, nearly triple its average quarterly profit of $57 million. These are the only two refiners that report California-only oil refining profits.

Consumer Watchdog said the high profits from the state refiners that report them helps to explain the odd, extreme current gap between retail and wholesale gasoline prices in the state.

Currently, California's wholesale market for gasoline, where oil refiners trade gas, is the cheapest in the country, but California drivers have been paying the highest price in the nation for a gallon of gasoline on the street

The price of gas at the pump in California usually costs 88 cents more than the price on the wholesale market. Today, drivers are paying $1.58 more than the wholesale market, a windfall for refiners, who are pocketing most of that extra cost.

"With all of California's refineries back online, drivers should be paying 70 cents less at the pump," said Consumer Watchdog researcher Cody Rosenfield. "There's no shortage. There are no refinery problems. Where are the savings for consumers?" On the California wholesale "spot" market where refiners trade large amounts of gasoline, a gallon costs $1.17, the lowest in the country, and 18 cents less than in Chicago, due to an overabundance of supply. Despite that, street prices in California are 45 cents more per gallon than in Chicago.

**The Historical Disconnect Between California and the Rest of the Country's Gas Prices**

69.     An August 19, 2015 article in the *Sacramento Bee* noted, "California's current average gasoline price is 98 cents more per gallon than the U.S. average, and was as much as $1.30 more this year.  This gap is unprecedented.  Over the 15 years that data have been collected, the price gap has averaged 28 cents."

70.     The *Los Angeles Times'* Ivan Penn detailed the record sustained discrepancy between California's prices and the prices of gasoline outside the state throughout the U.S., in a June 30, 2016 article:

> Gas prices in California typically run higher than the rest of the country due to higher-than-average taxes and fees, requirements to produce special low-pollution blends and the relatively small number of refineries in the state.

> But last summer the gap between the Los Angeles area prices and the rest of the country set records.

> For instance, California refineries reaped an average of 49.3 cents on a gallon of gasoline from 1999 to 2014, according to the California Energy Commission. But in summer 2015, the average ballooned to 88.8 cents, triggered when the refinery troubles in February of that year disabled 7% of the state's capacity at a time of low inventories.

> Gas prices remain higher than expected, about 68 cents higher in the L.A. area than the rest of the nation.

71.     The discrepancy continues to this day.  Calling it "California's mystery gasoline surcharge," the *San Diego Union Tribune* in an April 8, 2018 article explained that "Even after taking into account state gas taxes, blending requirements aimed at reducing air pollution and other environmental and climate fees attached to each gallon of fuel, it appears drivers in the Golden State pay a lot more than they should."  Quoting UC Berkeley professor Severin Borenstein, the article explains that the current unexplained surcharge is costing California motorists $12 million a

day.

**Gas Market in California Is Vulnerable to Manipulation Because of Its Structure and Characteristics**

72.    In addition to the factual data detailed above, which details production coordination between some refineries as well as the windfall profits achieved during the spikes, other characteristics of the market make collusion particularly attractive in this market.  Specifically, the market: (i) has high barriers to entry; (ii) has inelasticity of demand; and (iii) is highly concentrated.  In addition, the lack of available information and transparency makes it particularly easy for market participants to collude.

**High Barriers to Entry**

73.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where there are significant barriers to entry, however, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

74.    There are substantial barriers that preclude, reduce, or make entry more difficult into the gasoline market.  A new entrant into the business would face costly and lengthy start-up costs, including multimillion-dollar costs associated with research and development, manufacturing plants and equipment, energy, transportation, distribution, infrastructure, skilled labor and long-standing customer relationships.

75.    In addition to the costs of building a new refinery, given the nature of the product and California's unusual position in the market, any new entrant would have to comply with the various and complex regulations, including environmental regulations, imposed by state and federal agencies.  Compliance with the regulations would require extensive testing and the receipt of government

approvals, all of which would take years.

76.    Barriers to entry have only grown in the years since the U.S. Senate Majority staff of the Permanent Subcommittee on Investigations issued its report in 2002 (the "Senate Report").

**The Demand for Gasoline in California Is Inelastic**

77.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.   For example, demand is said to be "elastic," if an increase in the price of a product results in diminished revenues, with declines in the quantity sold of that product outweighing the effects of higher prices.   For products with a highly elastic demand, customers have many feasible alternatives for cheaper products of similar quality, and cut purchases sharply in the face of even small price increases.

78.    For a 'cartel' to profit from raising prices above competitive levels, market demand must be relatively less elastic at competitive prices, where an increase in price would result in a net increase in profit.   A less elastic demand is a market characteristic that facilitates collusion, by allowing producers to raise their prices without triggering customer substitution and sufficient lost sales revenues in order: to offset the beneficial effect of higher prices on profits for products, they still continue to sell.

79.    Gasoline sales are highly inelastic. People and businesses tend to have set driving patterns, and purchase a similar amount of gasoline no matter what the price is.   The Senate Report noted that "demand for gasoline in California is inelastic."

80.    Small reductions in the supply of gasoline can create sharp increases in the price per gallon.  Information about current or future inventory will have a near immediate effect on price.

**The Market for Gasoline in California Is Highly Concentrated**

81.    The West Coast is an "island" within the North American gasoline market, because there are no gas pipelines across the Rockies.  California itself is a smaller island within the West Coast because California law mandates a specific formulation for gas during spring and summer months. There are nineteen refineries on the West Coast, but ownership is concentrated with major oil companies owning two or three refineries each.  The top two refiners control nearly half of California capacity, the top four nearly 80%, and Defendants as a whole control over 90%. This is exactly the type of environment where market power is likely to exist, according to the Western States Petroleum Association.



82.     The Senate Report further noted that California is the second largest gasoline market in the world, following only the United States as a whole.  As opposed to other markets, the Senate Report noted "[a] small decrease in supply will produce a large increase in price."   Further, the report noted that the California refining industry is an oligopoly, where the top two refiners control nearly half the state's capacity, the top four "refiners owned nearly 80 percent of California capacity," and the top seven players (all of which are defendants herein) account for more than 92% of the market.  The Senate Report cites a number of documents from a lawsuit brought against the refiners in 1996, alleging an anticompetitive scheme by the refiners in retaliation to gasoline meeting the stringent specifications of the CARB.   The Senate Report concluded that the evidence produced in the case showed recognition by a number of the refiners and petroleum industry consultants that the small numbers of large refiners in California possess a significant degree of market power.

83.     A document generated by Chevron in 1993 as part of a strategic study, which was produced during discovery in the matter of *Aguilar v. Atlantic Richfield Co.*, No. 700810 (Cal. Super. Ct., San Diego Cnty.), and referred to in the Senate Report, also states that a few large refiners dominate the West Coast, and have a significant effect on the market.  The Chevron document contrasts the high returns of the refiners in the West Coast market, with the lower returns of refiners in the Gulf Coast, and attributes the difference, in part, to the concentrated nature of the West Coast market: "USWC market appears to allow better average returns than USGC [Gulf Coast].  The better performers generate [returns on capital employed] greater than 12%....  ***Market is dominated by a limited number of large, committed refiner/marketers whose individual actions can have significant market impact.***"

84. Another document relied upon by the Senate in its report was an "Energy Briefing Note" that was generated in 1996 by the PIRA Energy Group, a petroleum industry consulting organization, and presented to all of its "retainer clients," including ExxonMobil, regarding the impact of the introduction of CARB-compliant gasoline on refining margins. The Briefing Note reported that the supply/demand balance in California was likely to be "tight," and would remain so, partially as a result of the market structure in which a few refiners in the state had sufficient market power and motivation to maintain prices above marginal costs:

> The CARB 2 balance appears to be tight in California. Add in the remoteness of the California market, the unique characteristics of CARB 2, the requirement for domestic shippers to use higher cost Jones Act shipping, *and the small number of companies involved, all of whom share a motivation to recoup costs and not undermine the market. The implication is that prices on average will do quite a bit more than cover marginal costs,* which will mainly comprise the incremental oxygenate cost, although not during the extended phase-in period.

85. As the Senate Report found, "this PIRA memo presents a classic description of a market failure. In a purely competitive market, prices do not rise above marginal costs, which are the costs of producing an additional unit of the product."

86. The Senate Report, in looking at California, found "the high degree of vertical integration between the refining and marketing sectors raises prices within the state and raises the barriers for others to enter into the market or import gasoline, thus helping to keep the supply/demand balance tight and to sustain higher prices."

**Opportunity to Collude—Trade Associations**

87. Defendants BP West, Chevron, Tesoro, Shell, ExxonMobil, Valero, Phillips, and Alon, and various subsidiaries and defendant-affiliated entities, are all

members of an interconnected group of trade associations and organizations engaged in extensive lobbying and other activities related to the gas market.   These associations, which hold regular meetings, provide numerous opportunities for the defendants to conspire.

88.   Since the early 1900s, oil and gas companies such as Alon, Chevron, Phillips, ExxonMobil, Shell, Tesoro, and Valero have been members of industry trade associations such as the WSPA; American Petroleum Institute ("API"); American Fuel & Petrochemical Manufacturers ("AFPM"); Society of Independent Gasoline Marketers of America ("SIGMA"); and Petroleum Marketers Association of America ("PMAA").   These trade associations are dominated and controlled by the Defendants, as their representatives, predecessors, and affiliates, and actively participated in the trade associations' management and oversight.   Further, most of the revenue earned by the trade associations comes from membership fees and other payments from Defendants related to research, lobbying, trade shows, and conferences.   While the stated purpose of these trade associations is to ensure that consumers continue to have reliable access to petroleum and petroleum products, Plaintiffs allege certain members of these trade organizations have conspired amongst themselves to use these trade organizations to engage in anticompetitive discussions involving pricing, supply, and production levels.

89.   The trade associations provided a mechanism and venue through which the conspiracy was facilitated, implemented, and monitored.   Defendants met regularly prior to, and following the price spikes in May and October 2012, as well as in 2014 through 2016, attending sponsored meetings, conventions, and conferences hosted by these associations.

90.   For example, Chevron, Phillips, ExxonMobil, Shell, Tesoro, and Valero are all members of WSPA.   The dates that WSPA held meetings and conferences include, but are not limited to: January 13-14, 2010; October 6, 2010;

February 1-3, 2011; October 4-6, 2011; October 2-3, 2012; October 1-2, 2013, and February 12-13, 2015.

91.    Chevron, Phillips (board member), ExxonMobil (board member), and Shell are all members of APL.  The dates that API held meetings and conferences include, but are not limited to: April 26-28, 2010; November 15-17, 2010; May 16-18, 2011; November 14-16, 2011; March 19-23, 2012; November 12-16, 2012; November 11-13, 2013; April 22-26, 2013;  January 9, 2015; February 12, 2015; March 12, 2015; April 9, 2015; May 19, 2015; June 16, 2015; July 21, 2015; August 18, 2015; September 15, 2015; October 20, 2015; January 19, 2016; February 16, 2016; March 15, 2016; April 19, 2016; May 17, 2016; June 21, 2016; July 19, 2016; and August 16, 2016.

92.    Alon, Chevron, Shell, Tesoro, Phillips, ExxonMobil, and Valero (board member) are all members of AFPM.  The dates that AFPM held meetings and conferences include, but are not limited to: March 28-30, 2010; March 27-29, 2011; April 2-3, 2012; March 11-13, 2012; March 24-26, 2013; March 17-19, 2013; March 23-25, 2014; March 22-24, 2015; and March 13-15, 2016.

93.    Alon, Chevron, Shell, Valero, ExxonMobil, and Tesoro are all members of SIGMA.  The dates that SIGMA held meetings and conferences include, but are not limited to: April 29-May 2, 2010; July 19-21, 2010; November 12-14, 2010; November 3-6, 2011.  In 2014, SIGMA held an Executive Leadership Conference on January 26-29, 2014, along with other conferences throughout the year.  In 2015, SIGMA held their Executive Leadership Conference on February 8-11, 2015.  SIGMA also advertised their Masters Programs and Field Trips as "One to two day intensive training programs for fuel marketing leaders and executives." Similarly, they described their Share Groups as "One and a half-day subject-focused training, information sharing, and networking programs for employees of fuel marketing businesses."

94.     ExxonMobil, Shell, Chevron, and Valero are all members of PMAA. The dates that PMAA had meetings and conferences include, but are not limited to: October 4-5, 2010; September 30-October 1, 2011; February 22-24, 2011; February 21-23, 2012; April 15-16, 2014; May 13-15, 2014; July 29-31, 2014; August 6-8, 2014; September 23-24 , 2014; October 6, 7, 7-10, 15, 28-29, 2014; December 5-8, 9-10, 2014; August 5-7, 20-23, 31, 2015; September 8-10, 11-12, 13-16, 15, 16, 20-22, 21-23, 21-23, 22-23, 28-30, 2015; and October 10-11, 11-14, 21, 27-28, 2015.

95.     Not surprisingly, through various organizations, such as WSPA and API, Defendants are also active in lobbying efforts related to the gas industry. WSPA and API members recognized their common interests in promoting the interests of the industry as a whole, and collaborated in lobbying regulatory agencies to further such interests.  Because members have a convenient forum to consult each other regarding policy positions, they can ensure that they maintain a united stance.

96.     For example, the Center for Responsive Politics reported that from 2010 through 2013, Phillips spent $48,289,514 for lobbying efforts; Valero spent $2,903,000;  Tesoro  spent  $4,547,287;  and  ExxonMobil  spent  $51,570,000. Likewise, API also spent $32,550,000 lobbying the oil and gas industry for the same period.

**Opportunity to Collude—Information Sharing Services**

97.     The Defendants have also had ample opportunity to share pricing information with each other.  One manner in which Defendants do this is through OPIS, a market price information service whose client list includes most, if not all, of the Defendants, the top 200 oil companies, thousands of distributors, traders, government and commercial buyers and sellers of petroleum products worldwide. OPIS provides real-time and historical spot, wholesale/rack and retail fuel prices for the refined products, renewable fuels, and natural gas and gas liquids (LPG)

1   industries.  In addition, OPIS delivers exclusive news and insightful analysis on the

2   upstream, midstream, and downstream oil markets.  OPIS maintains the world's most

3   comprehensive database of U.S. wholesale petroleum prices, publishing more than

4   30,000 rack prices each day at over 1,500 terminals, in nearly 400 market locations.

5   Through OPIS, Defendants are able to share and access real time information about

6   spot fuel gasoline prices, wholesale rack fuel prices, and retail fuel prices.

7       98.   Another opportunity Defendants have to collude is through Platts,

8   another market intelligence company available to all Defendants.  Like OPIS, Platts

9   has a wealth of information about gasoline prices in all steps of the supply chain.

10  More concerning is the "Platts eWindow," which brings an immediacy to Platts price

11  discovery process which cannot be experienced anywhere else.  Its real-time trading

12  grid layout provides an enhanced, at-a-glance view of all named bids, offers, and

13  transaction data shared during the Platts Market on Close (MOC) price assessment

14  process.  According to Platts, this system allows Defendants to "monitor market

15  activity – know who is participating and use the information to analyze [their]

16  performance against specific participants or the rest of the market.  The data is

17  available in near real time, allowing you to see developments as they happen" and

18  "gain new levels of market transparency – see all trade data and every unmatched

19  bid and offer."

20      99.   Both Platts and OPIS provide Defendants with sophisticated platforms

21  which enable the Defendants to both share gasoline pricing information, and give the

22  Defendants the ability monitor the market to ensure that the market is not flooded

23  with excess gasoline which might drive down prices.

24  **Defendants Have Provided Pretextual Explanations for Their Anticompetitive**

25  **Conduct**

26      100.  Throughout the Class Period (as defined herein), the Defendants have

27  provided multiple, pretextual explanations related to their conduct.  As detailed

28

above, a fire at the Cherry Point refinery was blamed for the May 2012 price spike, even though the length of delay between the decline in product levels and the price increase was far outside of historical norms.  Similarly, when there was a fire at the Richmond refinery, it was blamed for a spike in August 2012.  But supply was not affected, as the lost production was more than made up by increased production at other refineries, thus calling into question the purported cause.  The public was also provided with pretextual explanations of supply shortages being the cause of the October 2012 spikes, but this explanation is also contradicted by the data, because inventories actually *increased* up to, and during the price spikes in 2012.  In a competitive market, this should have brought the prices down.

**Defendants Have Acted Against Their Independent Self-Interest**

101.  Indicative of Defendants' conspiratorial conduct are various actions taken against each individual defendant's economic self-interest.  Defendants have acted against their independent economic interest in numerous ways, including by exporting gas out of California including during periods where California's gasoline prices were the highest in the nation.  Jones Act vessels have come to California without gasoline or refused to unload their cargo in California, despite the fact that stocks were running low.  Furthermore, Defendants have decreased production, i.e., supply, by going forward with unnecessary maintenance procedures when other refineries were inoperable due to purportedly unplanned outages.  Indeed, the CEO of the company that acquired ExxonMobil's Torrance refinery stated that he "personally believe[d]" that "Exxon probably had made a decision that they were not going to run a single refinery operation in the state of California."  Furthermore, a number of refineries permitted dangerous conditions at refineries to fester, which predictably materialized into shutdowns resulting in costly supply decreases.

**Lack of Transparency**

102. Analysts have been hamstrung from assessing additional super-competitive price spikes in the California gasoline market by the lack of public disclosure of data, including outages and maintenance schedules, among other matters.

103. The lack of transparency also facilitates collusion, as Consumer Watchdog explained:

> Though the industry is far more consolidated than it was 15 years ago, another complicating factor is the total lack of industry transparency. Refineries keep tight control over data concerning their industry and operations. The California Energy Commission, which is the state's primary energy policy and planning agency, does not release any public estimates of days of supply. Indeed, it is not even clear that the agency has the data necessary to make this calculation with 100 percent accuracy.

> This information would be critical to know in case of a statewide or national disaster. No real time collection of data exists. The EIA's inventory data is three months behind, and this federal agency does not keep track of current days of supply. No federal or state agency maintains centralized information on current or historical refinery status whether a refinery is closed, for how long, whether the refinery had an accident, how much of its capacity the refinery is utilizing, and how big its gas reserves are on hand. Thus the public remains in the dark on refinery operations, and traders can run up the price of gas more easily on mere speculation.

104. At the same time, refineries keep tight control over data concerning their industry and operations. The California Energy Commission, which is the state's primary energy policy and planning agency, does not release any public estimates of days of supply. No real-time collection of data exists. The EIA's inventory data is three months behind, and this federal agency does not keep track of current days of supply. No federal or state agency maintains centralized information on current or historical refinery status, whether a refinery is closed, for how long, if

they had an accident, how much capacity is being utilized, and how big gas reserves are. Thus, the public remains in the dark on refinery operations. Defendants are able to take advantage of the dearth of information on refinery operations, thus allowing prices to be run up on mere speculation and misinformation. By contrast, refiners are well aware of this information through exchange agreements, which are agreements that allow refiners to exchange petroleum products with other refiners at an agreed rate of exchange. Through such agreements, refiners acquire refined products to supplement supply to their customers when they are short on supply. The exchange agreements signal to the other refiners the amount of time a refinery will be offline. This type of signaling is a recognized plus factor.

105. Bob van der Valk, senior editor of the *Bakken Oil Business Journal*, reached a similar conclusion, "[w]e have an ill-equipped market, so it is prime to be manipulated and it is being manipulated."

**Investigations**

106. Senators and representatives have urged the government to delve into the price spikes over the years. For example,

107. Senator Dianne Feinstein also wrote to the Federal Trade Commission ("FTC") requesting an investigation. Senator Feinstein expressed concern that the FTC had failed "to take action to protect California consumers from malicious trading schemes in the California gasoline market." She requested that the FTC "open an immediate investigation into price spikes in California, to begin collecting relevant data on California's gasoline markets, and to establish a permanent market monitoring team." She also requested that the "FTC immediately seek data sharing agreements that will allow it to monitor gasoline and oil markets actively and effectively. Data on prices, trading activity, refinery output, demand, stocks, and other information are vital to determine if trading activities reflect fraud, manipulation, or other malicious trading practices."

108.   Senator Feinstein closed her letter with a call for serious and aggressive enforcement: "California's consumers are all too familiar with energy price spikes which cannot be explained by market fundamentals, and which turn out years later to have been the result of malicious and manipulative trading activity....  I call on the FTC to act immediately and aggressively to protect California's consumers." To date, while it is believed investigations are ongoing, no action has been taken regarding the May and October 2012 spikes, despite significant evidence that the price spikes were the result of manipulative and collusive conduct by Defendants.

109.   Then, following the issuance of the McCullough Report, Congressman Peter DeFazio of (D. Or.) on November 19, 2012, wrote to then Attorney General Eric Holder, calling the lack of progress on an investigation into high West Coast gas prices "intolerable."  Congressman Defazio noted in the letter that he had written "to the so-called Gas Price Fraud Working Group calling for an investigation. Nothing happened.  I wrote to the president and raised the issue of market manipulation by California refineries.  Nothing.  It's time for the Department of Justice to step up and do what they are supposed to do: crack down on, or at least investigate, illegal energy market activity."

110.   Congressman DeFazio continued: "Basically, this independent research shows that California refineries were misleading the public.  Refinery outages and maintenance shutdowns just provided a convenient excuse and explanation for 'declining' gas production so they could jack up the price of refined gasoline.... Hugely profitable oil companies who continue to look for every opportunity to rip off American drivers need to be held accountable for their blatant market manipulation.  Enough is enough. Serious action is needed now."

111. Congressman DeFazio's letter further claimed "these devastatingly high gas prices on the West Coast appear to be a result of market abuses by a handful of California refineries – not the 'dynamics of supply and demand' as the

oil and gas industry has facetiously claimed for decades while laughing all the way to the bank."   The Congressman further noted: "The behavior of California refineries over the last six months has been suspicious at best and malicious at worst."

112.   In April 2011, then Attorney General Holder announced the creation of the Oil and Gas Price Fraud Working Group ("Working Group") "to help identify civil or criminal violations in the oil and gasoline markets, and to ensure that American consumers are not harmed by unlawful conduct."

113.   The Working Group was cochaired by the Commodities Futures Trading Commission, Federal Trade Commission, and the National Association of Attorney Generals.  Other Working Group members include the Department of the Treasury, the Federal Reserve Board, the Securities and Exchange Commission, the Department of Justice's Criminal Division, Civil Division, and Antitrust Division, the Federal Bureau of Investigations, the United States Attorney's Office for the Western District of New York, the Executive Office for United States Attorneys, as well as the Departments of Agriculture and Energy.

114.   When the Working Group was formed, the intention was to explore whether there was any evidence of manipulation of oil and gas prices, collusion, fraud, or misrepresentations at the retail or wholesale levels that would violate state or federal laws.  The working group also explored whether consumers or the federal government as a purchaser of oil and gas were harmed, and to evaluate developments in commodities markets, including an examination of investor practices, supply and demand factors, and the role of speculators and index traders in oil futures markets.

115.   To date, the Working Group has issued no reports regarding the May and October 2015 price spikes, although it is believed that based on calls to action by members of Congress, an investigation is ongoing.

**California's Rules Regarding Gasoline Formation Is Not Responsible for the Sustained Supracompetitive Pricing**

116.  On August 16, 2016, Edie Chang, Deputy Executive Officer of the CARB, detailed the following reasons why California's reformulated gasoline requirements do not explain the price spikes in 2015:

> CARB does not believe the California Reformulated Gasoline (CaRFG) rule was a significant factor in the recent gasoline price spike:
>
> • CaRFG regulations have remained unchanged since 2012;
>
> • Prior supply disruptions and associated price increases (under the same CaRFG rules) have been much shorter in duration;
>
> • There is significant global refining capacity that can make California Reformulated Gasoline Blendstock for Oxygenate Blending (CARBOB);
>
> • California refiners routinely assert that the State's refineries have excess gasoline production capacity and that the industry is highly exposed to import competition if compliance costs under AB 32 become too great; and
>
> • Like the PMAC we are concerned with the length and magnitude of the California vs. national gasoline price differentials that have occurred since early 2015, but we have yet to see convincing evidence that the proposed mechanism is an appropriate way to address price differentials.

## JURISDICTION AND VENUE

117.  This Court has both personal and subject matter jurisdiction over this case, pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711, *et seq*., which vests original jurisdiction in the district courts of the United States for any class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5 million amount in

controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

118. Venue is proper in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District.

119. This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (i) transacted business in this District; (ii) provided services in this District; (iii) had substantial contacts with this District; and/or (iv) was engaged in an illegal conspiracy that was directed at, and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

120. The anticompetitive conduct, and its effects on California commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Class.

121. By reason of the unlawful activities alleged herein, Defendants substantially affected commerce in California, causing injury to Plaintiffs and members of the Class.

122. Defendants' conspiracy and wrongdoing described herein adversely affected persons in California, including Plaintiffs and members of the Class.

123. Many of the unlawful acts occurred in California and, more particularly, in San Diego County. Plaintiffs are all residents of San Diego. In addition, all Defendants do business in San Diego County, and venue is therefore proper in the Southern District of California.

## PARTIES

124. Plaintiff Richard Bartlett is a San Diego, California, resident. During the Class Period, Plaintiff Bartlett purchased gasoline in San Diego that was

processed by one or more of the Defendants' refineries.  Plaintiff Bartlett paid more than he would have, absent Defendants' illegal actions.

125.  Plaintiff Kristine Snyder is a San Diego, California, resident.  During the Class Period, Plaintiff Snyder purchased gasoline in San Diego that was processed by one or more of the Defendants' refineries.  Plaintiff Snyder paid more than she would have, absent Defendants' illegal actions.

126.  Defendant BP West is a Delaware limited liability company with principal executive offices located at 4519 Grandview Road, Blaine, Washington.  Defendant BP West owns and operates a network of gas and fueling stations in California, Oregon, Washington, Nevada, and Arizona.  During the Class Period, defendant BP West operated a 650 acre refinery in Carson, California, with a crude oil distillation capacity of 266,000 barrels per day.  Defendant BP West operates as a subsidiary of BP p.l.c.

127.  Defendant Chevron is a Pennsylvania corporation with principal executive offices located at 6001 Bollinger Canyon Road, San Ramon, California.  Defendant Chevron explores, extracts, and produces crude oil, natural gas, and natural gas liquids.   Defendant Chevron also refines, markets, and distributes products derived from petroleum other than natural gas liquids.   Defendant Chevron was formerly known as Gulf Oil Corporation.   Defendant Chevron operates as a subsidiary of Chevron Corporation.   Defendant Chevron operates refineries in Richmond and El Segundo, California.   According to defendant Chevron, its Richmond refinery processes approximately 250,000 barrels of crude oil per day and produces gasoline that fuels roughly 20% of the cars driven on Northern California roads, and its El Segundo refinery typically processes 235,000 barrels of crude oil per day and has 20% of the gasoline market share in Southern California.

128.  Defendant Tesoro is a Delaware limited liability company with principal executive offices located at 19100 Ridgewood Parkway, San Antonio,

Texas.  Defendant Tesoro offers refining and marketing of motor fuels and petroleum products.  Defendant Tesoro was formerly known as Tesoro West Coast Company, LLC and changed its name to Tesoro Refining & Marketing Company LLC in January 2002.  Defendant Tesoro, incorporated in 1996, operates as a subsidiary of Andeavor (f/k/a Tesoro Corporation).  Defendant Tesoro operates refineries in Los Angeles and Martinez, California. According to Tesoro, its Los Angeles refinery is the largest refinery on the West Coast of the Unites States.

129.  Defendant Shell is a Delaware limited liability company with principal executive offices located at 150 N. Dairy Ashford, Houston, Texas.  Defendant Shell operates refineries and crude oil pipelines in the western United States.  Defendant Shell also operates a network of gasoline stations in the United States.  Defendant Shell's Martinez refinery has been in operation since 1915.  Defendant Shell is a wholly-owned subsidiary of Royal Dutch Shell plc.

130.  Defendant ExxonMobil is a New Jersey corporation with principal executive offices located at 5959 Las Colinas Boulevard, Irving, Texas.  Defendant ExxonMobil operates as a subsidiary of ExxonMobil Corporation.  Defendant ExxonMobil's Torrance refinery covers 750 acres, employs approximately 650 employees and 550 contractors, processes an average of 155,000 barrels of crude oil per day, and produces 1.8 billion gallons of gasoline per year.  During the Class Period, the Torrance facility regularly provided 10% of California's gasoline capacity and 20% of the capacity in Southern California.

131.  Defendant Valero is a Delaware corporation with principal executive offices located at One Valero Way, San Antonio, Texas.  Defendant Valero refines and markets crude oil in the United States and internationally.  Defendant Valero's activities include refining operations, wholesale marketing, product supply and distribution, and transportation operations primarily in the Gulf Coast, Mid-Continent, West Coast, and northeast regions.

132. Defendant Phillips is a Delaware corporation with principal executive offices located at 600 N. Dairy Ashford, Houston, Texas. During the Class Period, defendant Phillips operated a San Francisco refinery that was comprised of two facilities linked by a 200-mile pipeline: the Santa Maria facility, located in Arroyo Grande, California, and the Rodeo facility, located in the San Francisco Bay Area.

133. Defendant Alon is a Delaware corporation with principal executive offices located at 12700 Park Central Drive, Dallas, Texas. Defendant Alon is refiner and marketer of petroleum products, operating primarily in the South Central, Southwestern, and Western regions of the United States. Alon's Bakersfield refinery has a capacity of 70,000 barrels a day and comprises over 600 acres of land. In July 2017, defendant Alon was acquired by Delek US Holdings, Inc. ("Delek") and is now Delek's wholly-owned subsidiary.

134. Each of the Defendants is a participant in the California gasoline refinery market.

135. The true names and capacities of defendants sued herein under California Code of Civil Procedure section 474 as Does 1 through 25, inclusive, are presently not known to Plaintiffs, who therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class.

## CLASS ALLEGATIONS

136. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2), and b(3) of the Federal Rules of Civil Procedure on behalf of all Class Members. The Class is defined as:

> All persons or entities that purchased or paid the retail price for gasoline for consumption by themselves, their families, or their members, employees, or insured in California that was refined or produced by a

defendant during the Class Period (February 1, 2012 to present) and were damaged thereby.  Excluded from the Class are defendants, their parent companies, subsidiaries, and affiliates, any coconspirators, governmental entities, and instrumentalities of the government, states, and their subdivisions, agencies, and instrumentalities.

137.   The Class is ascertainable and is one for which records should readily exist.

138.   Plaintiffs do not know the exact size of the Class, but because the nature of the trade and commerce involved, Plaintiffs believe that there are millions of Class members as above described, the exact number and their identities is not presently known, but can be determined through appropriate discovery.

139.   There is a well-defined community of interest among Plaintiffs and the members of the Class.   Because Defendants have acted in a manner generally applicable to the Class, questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual members of the Class.   Such generally applicable conduct is inherent in Defendants' wrongful and anticompetitive conduct.

140.   There are questions of law and fact common to the Class, including:

(a)   whether Defendants and their coconspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of gasoline in California;

(b)   the identity of the participants of the alleged conspiracy;

(c)   the duration of the conspiracy alleged herein and the acts performed by Defendants and their coconspirators in furtherance of the conspiracy;

(d)   whether Defendants violated the Cartwright Act;

(e)   whether Defendants violated the UCL;

(f)   whether the conduct of Defendants and their coconspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and

1    the other members of the Class;

2            (g)    the effect of Defendants' alleged conspiracy on the prices of

3    gasoline in California during the Class Period;

4            (h)    the appropriate Class-wide measure of damages; and

5            (i)    the appropriate nature of Class-wide injunctive or other

6    equitable relief.

7        141.   There are no defenses of a unique nature that may be asserted against any

8    Plaintiff individually, as distinguished from the other members of the Class, and the

9    relief sought is common to the Class.

10       142.   Plaintiffs are members of the Class and their claims are typical of the

11   claims of the other members of the Class.   Plaintiffs were damaged by the same

12   wrongful conduct of Defendants.

13       143.   Plaintiffs will fairly and adequately protect the interests of other Class

14   members because they have no interests that are antagonistic to, or that conflict with,

15   those of any other Class member.   Rather, Plaintiffs' interests are coincident with those

16   of the other members of the Class.

17       144.   Plaintiffs are committed to the vigorous prosecution of this action and

18   have retained competent counsel, experienced in litigation of this nature, to represent

19   them and the other members of the Class.

20       145.   A class action is the superior method for the fair and efficient adjudication

21   of this controversy.   Class treatment will enable a large number of similarly situated

22   parties to prosecute their claims in a single forum simultaneously, efficiently, and

23   without the unnecessary duplication of evidence, effort, and expense that would result if

24   individual actions were pursued.

25       146.   This case is also manageable as a class action.   Plaintiffs know of no

26   difficulty to be encountered in the prosecution of this action that would preclude its

27   maintenance as a class action.

28

147. Defendants' unlawful acts alleged in this Complaint had a substantial effect on commerce and caused antitrust injury to Plaintiffs and the Class.

148. Defendants' unlawful acts had the purpose and effect of manipulating the price of gasoline sold in California.

149. As a direct result of Defendants' violations, Plaintiffs and the members of the Class have been damaged in their property or business.

150. As a direct and foreseeable result of Defendants' unlawful anticompetitive acts, the price of gasoline sold in California was manipulated and inflated.

## ANTICOMPETITIVE CONDUCT BY THE DEFENDANTS

151. Defendants are horizontal competitors.

152. The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their coconspirators in furtherance of which Defendants fixed, maintained, or made artificial prices for gasoline sold in California during the Class Period. Defendants' conspiracy constitutes a *per se* violation of the Cartwright Act and is an unreasonable and unlawful restraint of trade and an unlawful, unfair, or fraudulent practice under the UCL.

153. At all relevant times, other corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein. The individuals and entities acted in concert by joint ventures and by acting as agents for principals, in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of gasoline prices in California.

## PLAINTIFFS' CLAIMS ARE TIMELY

154. Plaintiffs bring their claims within the statute of limitations.

155. Even though Plaintiffs' claims are timely, facts indicating Defendants

1  were engaging in misconduct that caused gasoline prices in California to be
2  artificially manipulated were actively concealed by Defendants.

3  **PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY**

4  156.  Plaintiffs have suffered significant injury as a result of Defendants'
5  gasoline price manipulation conspiracy.

6  157.  Defendants' price-fixing conspiracy had the following effects, among
7  others: (i) price competition has been restrained or eliminated with respect to gasoline
8  sold in California; (ii) the price of gasoline sold in California has been fixed, raised,
9  maintained, or stabilized at artificially inflated levels; and (iii) purchasers of gasoline
10 sold in California have been deprived of free and open competition.  During the Class
11 Period, Plaintiffs and the members of the Class paid supracompetitive prices for
12 gasoline sold in California.

13 158.  By reason of the alleged violations of California laws, Plaintiffs and the
14 members of the Class have sustained injury to their businesses or property, having paid
15 higher prices for gasoline sold in California than they would have paid in the absence of
16 Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered
17 damages in an amount presently undetermined.  This is an antitrust injury of the type
18 that the antitrust laws were meant to punish and prevent.

19 159.  In formulating and effectuating the contract, combination, or conspiracy,
20 Defendants and their coconspirators engaged in anticompetitive activities, the purpose
21 and effect of which were to fix, maintain, suppress, inflate, and otherwise make
22 artificial the price of gasoline sold in California.

23 160.  Plaintiffs suffered antitrust injury in that they paid more for gasoline than
24 they would have paid had the manipulation not occurred.

25 161.  Injury to Plaintiffs and the Class also resulted from Defendants'
26 deprivation of the benefits of free and open competition in the market for gasoline sales.

27 162.  Plaintiffs suffered antitrust injury as a result of Defendants' actions.

28

## COUNT I

### Violations of the Cartwright Act

163.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

164.   The acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq.*

165.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California, the purchasers reside in California, the refineries at issue are in the state and because other overt acts in furtherance of the conspiracy and overcharges flowing from those acts occurred in California, and the Class purchased gasoline in California.

166.   As detailed above, the anticompetitive conduct described constitutes a *per se* violation of California's antitrust laws and is an unreasonable and unlawful restraint of trade.   The anticompetitive effects of Defendants' conduct far outweigh any purported nonpretextual, procompetitive justification.

167.   As a proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class they seek to represent have been injured in their business or property in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq.*, by paying supracompetitive prices for gasoline during the Class Period.  Such overcharges are the type of injury the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.  Plaintiffs and members of the Class are proper entities to bring a case concerning this conduct.

168.   Plaintiffs and members of the Class have standing to and hereby seek monetary relief, including treble damages, together with other relief, as well as attorneys' fees and costs, as redress for Defendants' Cartwright Act violations.

## COUNT II

### Violations of the Unfair Competition Law

169.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

170.   Plaintiffs bring this claim under sections 17203 and 17204 of the Cal. Bus. & Prof. Code to enjoin, and obtain restitution and disgorgement of all monetary gains that resulted from acts that violated section 17200 of the Cal. Bus. & Prof. Code, commonly known as the UCL.

171.   Plaintiffs and the members of the Class have standing to bring this action under the UCL because they have been harmed and have suffered injury by being forced to pay inflated, supracompetitive prices for gasoline sold in California during the Class Period.

172.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their coconspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth herein, and these acts constitute unfair competition in violation of the UCL.

173.   Defendants' conspiracy had the following effects, among others: (i) price competition in the market for gasoline sold in California during the Class Period was restrained, suppressed, and/or eliminated; (ii) prices for gasoline sold in California during the Class Period sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels; and (iii) Plaintiffs and members of the Class who purchased gasoline sold in California during the Class Period directly from Defendants have been deprived of the benefits of free and open competition.

174.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business or property by

1  paying more for gasoline sold in California during the Class Period purchased directly

2  from Defendants than they would have paid the absence of the conspiracy.

3      175. The anticompetitive behavior, as described above, is unfair,

4  unconscionable, unlawful, and fraudulent, and in any event it is a violation of the policy

5  or spirit of the UCL.

6                          **<u>PRAYER FOR RELIEF</u>**

7      WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that the

8  Court:

9      A.    Determine that this action may be maintained as a class action pursuant

10 to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and direct that reasonable notice of this

11 action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, and declare

12 that the Plaintiffs are representative of the Class;

13     B.    Enter joint and several judgments against Defendants and in favor of

14 Plaintiffs and the Class, awarding them damages as a result of Defendants' unlawful

15 conduct alleged in this Complaint, plus treble damages and all other available

16 damages, including any statutory or liquidated damages or otherwise;

17     C.    Award to Plaintiffs and the Class their costs of suit, including

18 reasonable attorneys' and experts' fees and expenses;

19     D.    Order that Defendants, their directors, officers, employees, agents,

20 successors, members, and all persons in active concert and participation with them

21 be enjoined and restrained from, in any manner, directly or indirectly, committing

22 any additional violations of the law as alleged herein; and

23     E.    Award any other and further relief as the Court may deem just and

24 proper.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated: June 21, 2018

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE AGUILAR
MICHAEL NICOUD

*/s/Brian J. Robbins*

BRIAN J. ROBBINS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
mnicoud@robbinsarroyo.com

Attorneys for Plaintiffs

1276005