UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF, INC., <br><br>Plaintiff, <br><br>v. <br><br>BP WEST COAST PRODUCTS, INC., et al., <br><br>Defendants. | Case No.: 15-cv-1749-TWR-AGS <br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SANCTIONS (ECF 502)** |
| Richard BARTLETT, et al., individually and on behalf of all others similarly situated, <br><br>Plaintiff, <br><br>v. <br><br>BP WEST COAST PRODUCTS, INC., et al., <br><br>Defendants. | Case No.: 18-cv-1374-TWR-AGS (consolidated with No. 18-cv-01377-DMS-AGS) <br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SANCTIONS (ECF 356)** |

Plaintiffs have long claimed that defendants conspired to fix gasoline prices. But neither plaintiffs' complaints nor their discovery responses ever suggested that defendants conspired to fix prices for *diesel* fuel. The $4.6 billion-dollar allegation of diesel-fuel price-fixing first arose, instead, in plaintiffs' expert report. Because plaintiffs may not amend their complaints or their responses in this five-year-old litigation through an expert report, defendants' motion to strike that portion of the report is granted.

## BACKGROUND

In this antitrust case, plaintiffs broadly allege that defendants engaged in price-fixing in the California oil industry. (*See generally* ECF 76.)[1] One of plaintiffs' damages experts, Dr. Paul Hanouna, calculated damages of around $15 billion, including $4.6 billion in the diesel-fuel market alone. (*See* ECF 504-2, at 580, 632.) Defendants jointly moved to strike portions of plaintiffs' expert reports for including new and undisclosed theories of liability. (*See generally* ECF 502.) This Court denied the bulk of defendants' motion to strike. (*See generally* ECF 540, 542.) But the Court took one question under advisement: By including diesel-fuel damages in Dr. Hanouna's report, did plaintiffs improperly introduce a new theory of liability without fair notice? (*See* ECF 540, at 29.)

## ANALYSIS

Plaintiffs don't contest that gasoline and diesel are different products. They insist instead that defendants had fair notice that diesel was always embraced by their claims. But plaintiffs' complaints and discovery responses seem to tell a different story.

**A.   The Complaints**

If diesel fuel is part of this case, that should be apparent from the complaints. Civil complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908 (9th Cir. 2011) (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)). To satisfy this requirement, the complaint must provide defendants with "fair notice of what the claim is and the grounds upon which it rests." *Id.* (alteration omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If an expert report contains new claims not included in the complaint, "Federal Rule of Civil Procedure 8 . . . preclude[s] consideration" of those parts of the report. *Id.*

---

[1] For ease of reading, all ECF cites will be to the original *Persian Gulf* case, 15-cv-1749-TWR-AGS, except where otherwise noted.

2

15-cv-1749-TWR-AGS

Yet, unlike Dr. Hanouna's report, the detailed complaints in both cases map out a conspiracy to fix prices for gasoline, not diesel fuel. In the very first numbered paragraph of the *Persian Gulf* First Amended Complaint, plaintiffs allege: "For years Californians have seen tremendous spikes in gasoline prices, seemingly untethered to normal market forces of supply and demand." (ECF 76, at 2.) In defining the conspiracy, plaintiffs were again clear that their claims were based on gasoline-price manipulation:

> The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices for *gasoline* sold in California during the Class Period through supply constraints (*e.g.*, exporting *gas* products, not importing sufficient *gas* products and maintaining low *gas* reserves), pretextual and/or wilful refinery outages and roiling the markets by injecting misinformation.

(ECF 76, at 68 (emphasis added).)

Likewise, all three individual counts focus on gasoline, not diesel fuel. (*See id.* at 70 (Count I: "The conspiracy consisted of a continuing agreement . . . [in] which Defendants artificially fixed, raised, maintained and/or stabilized the prices for gasoline in California."); *id.* at 71 (Count II: "Plaintiff and the [putative class] . . . have been injured. . . by paying supracompetitive prices for gasoline . . . ."); *id.* at 72 (Count III: "(a) price competition in the market for gasoline sold in California . . . was restrained, suppressed, and/or eliminated; (b) prices for gasoline sold in California . . . have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels; and (c) Plaintiff and members of the Class who purchased gasoline sold in California . . . directly from Defendants have been deprived of the benefits of free and open competition.").) The Consolidated Complaint in the *Bartlett* matter makes functionally identical claims, although limited to only two counts. (*See, e.g.*, ECF 44, 18-cv-1374-TWR-AGS, at 2 ("Defendants, gasoline refiners, have used their market leverage to keep gasoline prices in California well above the U.S. average . . . ."); *id.* at 50 (conspiracy definition: "Defendants fixed, maintained, or made artificial prices for gasoline sold in California"); *id.* at 51 (Count I: "paying supracompetitive prices for gasoline"); *id.* at 52 (Count II: "prices for

gasoline sold in California . . . have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels").)

Plaintiffs' definition of the putative class in each case similarly refers only to gasoline. (*See* ECF 76, at 65 ("All persons or entities that purchased gasoline directly from a defendant . . . and were damaged thereby."); ECF 44, 18-cv-1374-TWR-AGS, at 47 ("All persons or entities that purchased or paid the retail price for gasoline . . . in California that was refined or produced by a defendant . . . and were damaged thereby.").)

Even after scouring the complaints, the Court finds no indication of a conspiracy regarding diesel-fuel prices. In the 73-page *Persian Gulf* Amended Complaint, the words "gas" or "gasoline" appear 314 times. (*See* ECF 76, *passim*.) The 53-page *Bartlett* Consolidated Complaint features those same terms an additional 200 times. (*See* ECF 44, 18-cv-1374-TWR-AGS, *passim*.) By contrast, the word "diesel" does not appear in the *Bartlett* complaint at all, and the *Persian Gulf* complaint mentions it only once, in passing. (*See* ECF 76, at 30; ECF 44, 18-cv-1374-TWR-AGS, *passim*.) The lone use of the word "diesel" appears in a table of 17 refinery closings in a section describing why "industry sources" thought a refinery was closed. (ECF 76, at 30 ("Work may focus on hydrocracker used for diesel production, which was scheduled to have maintenance in June.").)

Nonetheless, plaintiffs argue that gasoline and diesel are both petroleum products, with intertwined markets, and that their complaints identify some refineries where both products are processed. (*See* ECF 511, at 21.) But that is beside the point. Defendants aren't required to divine plaintiffs' claims by researching the markets of other unspecified commodities. Nor must they track down every product processed at the referenced refineries. A complaint is a roadmap of the case, not a scavenger hunt. *See, e.g.*, *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 350 (S.D.N.Y. 2011) ("[A complaint] is not an invitation to a scavenger hunt in which defendants and courts are tasked with unearthing and deciphering clues and omens from assorted documents unmentioned—or at best barely alluded to—in the pleadings."), *aff'd*, 466 F. App'x 39 (2d Cir. 2012). If plaintiffs sought to hold defendants accountable for misdeeds in the diesel market, they must say so in a

"short and plain statement of the claim." *See* Fed. R. Civ. P. 8(a)(2). Their gasoline claim meets this standard; the purported diesel claim does not.

Because the complaints allege no diesel-fuel theory of liability, the portion of Dr. Hanouna's report on diesel-related damages is stricken. *See Oliver*, 654 F.3d at 908.

## B.   Discovery Responses

Plaintiffs' discovery responses do not suggest a different result. In fact, they underscore a second problem with Dr. Hanouna's report: it would inappropriately amend plaintiffs' interrogatory responses after fact discovery closed. Litigants have an ongoing duty to timely "supplement or correct" discovery responses when they learn new responsive information, unless this information has "otherwise been made known to the other parties." *See* Fed. R. Civ. P. 26(e)(1)(A). When a party fails to do so, that party "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). "A party aggrieved by an untimely amendment to damages contentions, or an expert report that exceeds their scope, may therefore move to strike the offending material under those rules." *Looksmart Grp., Inc. v. Microsoft Corp.*, 386 F. Supp. 3d 1222, 1232 (N.D. Cal. 2019).

Unlike the complaints, plaintiffs mentioned diesel multiple times at depositions and in their discovery requests and responses. (*See, e.g.*, ECF 513-2, at 2-20 (table listing discovery requests, responses, and meet-and-confer efforts using the word "diesel").) For example, in plaintiffs' interrogatories, they defined "Light Petroleum Products" to include diesel. (ECF 511-15, at 3.) Plus, smatterings of "diesel" allusions are scattered throughout approximately 1,300 pages of plaintiffs' interrogatory responses. (*See* ECF 513, at 8; ECF 522, at 7.) But most of these diesel mentions are irrelevant asides or appear in documents concerning gasoline refinement or sale. (*See, e.g.*, ECF 513-2, at 15 (quoting a Tesoro Marketing employee who told his boss that "the hydrogen unit . . . shut down . . . will cut our gas and diesel production in half"); *id.* at 17-18 (noting, in an interrogatory response regarding Tesoro's CEO's concerns about maintenance employees leaking refinery-

5

shutdown information, that the CEO asked, "[D]o you know if we were required to purchase gasoline or diesel in the LA spot market yesterday?").)

And none of these diesel references fairly put the defense on notice that plaintiffs were seeking damages for diesel price-fixing. For instance, if plaintiffs truly had a multibillion-dollar diesel claim lurking in their complaint, one might expect them to trumpet this when the defense demanded to know why they wanted diesel-trader communications. Plaintiffs' counsel instead responded by suggesting that such communications might offer insights into defendants' *gasoline*-market activity: "[T]he supply and trading of gasoline and diesel are intertwined such that a West Coast diesel trader's communications would be relevant if, as one example, emails showed a focus on obtaining and trading diesel during or preceding times when gasoline inventories were low." (ECF 513-2, at 19-20.) At any rate, this meandering response scarcely heralded a request for diesel damages.

Plaintiffs' greatest challenge, however, involves Chevron's Interrogatory 10, which asked plaintiffs to identify the critical price-fixing agreement(s) between defendants.[2] (*See* ECF 504-2, at 8.) In plaintiffs' ten-and-a-half-page narrative response, the word "diesel" never turns up. Rather, plaintiffs defined the agreement as one "to fix, maintain, or make artificial prices for gasoline sold in California." (ECF 504-2, at 17.) In describing how the agreement was executed, plaintiffs again never mentioned diesel, but repeatedly referenced gasoline. (*Id.* ("[1] through supply constraints (e.g., exporting gas products, not importing

---

[2] Plaintiffs' answers to this question led to discovery litigation, and the Court ultimately agreed with plaintiffs that the question was a "contention interrogatory." (*See* ECF 489, at 6.) The Court concluded that such an interrogatory was proper at this stage, but denied Chevron's motion to compel because plaintiffs had—over three responses—answered each part of the question in a reasonably clear manner. (*See id.* at 7-8, 28.) The Court addressed Chevron's main concern that plaintiffs would "add to that [response] later on" by pointing out that plaintiffs were now "bound by the agreement they'[d] identified." (*Id.* at 28.)

sufficient gas products and maintaining low gas reserves), . . . and [4] sending misinformation and failing to correct misinformation to media and regulators reporting and monitoring the price and supply of gasoline in California."). Then, plaintiffs detailed specific instances of conspiratorial action (some by reference), each of which referred only to gas or gasoline.[3] (*Id.* at 17-19.)

Plaintiffs are bound by this response. Because they never sought to correct or supplement their responses to include diesel before the close of fact discovery, plaintiffs may not do so now through an expert report. *See Looksmart Grp., Inc.*, 386 F. Supp. 3d at 1232. And no one has argued—after five years of litigation and millions of pages of discovery—that such an amendment would be "substantially justified or harmless." *See* Fed. R. Civ. P. 37(c)(1). So, the portion of Dr. Hanouna's report concerning diesel must also be stricken under Rule 37.

## CONCLUSION

Diesel price-fixing was not among the allegations in the complaints. And plaintiffs never mentioned diesel in their responses to contention interrogatories demanding a description of the price-fixing conspiracy. An expert report on diesel-related damages cannot cure these defects. Thus, defendants' motion to strike the diesel portion of Dr. Hanouna's report is **GRANTED**.

Dated: December 17, 2020

Hon. Andrew G. Schopler
United States Magistrate Judge

---

[3] There are similar contention interrogatories and responses sprinkled throughout the discovery. The Court need not belabor the point further, other than noting that plaintiffs did not mention diesel in any of those either.